Good morning. Welcome. Our first case on the call of the docket today for Thursday, September 13, 2012, is agenda number 10. Case number 113875 N. Ray A.P. et al. Counsel for the appellant, please proceed. Good morning, Your Honors. If it please the Court, I am Sharon Purcell, Assistant Attorney General on behalf of the people of the State of Illinois. At issue in this case is, first, an adjudication of neglect of the minors, A.P. and J.P., by reason of an injurious environment. And secondly, whether the trial court properly exercised its discretion when it admitted into evidence a record from the Pediatric Resource Center. First, we are asking this Court to reaffirm the two-step procedure that it set out in Arthur H. that the Juvenile Court Act requires when a petition for adjudication of abuse or neglect is filed. Under that two-stage proceeding, when as here, the first step, a petition for adjudication is brought alleging abuse and neglect by reason of an injurious environment. And I'll just say right away that the allegation of abuse that was originally brought in the case of A.P., the trial court found was not, people did not prove it was the allegation of neglect by injurious, as a result of an injurious environment that was found in this case. But at the first step, when that petition is filed, what matters initially is only whether the child is neglected because a certain condition or conditions exist, such as is defined in Section 231B, which is pertinent to this case, an environment which is injurious to his or her welfare. And it makes sense that at that point, that's the initial focus, is on the child's status. Because after all, the Act is set forth in Section 12, the mandate of the Act is to protect children. So the Court is not interested in assigning blame. It's just interested at the adjudicatory stage of what is this child's status, as does the evidence by preponderance of the evidence show that the child has been neglected. Ms. Purcell, did the appellate court get it backwards? Did they go off track, in other words, and focus on the action of what the knowledge of the respondent was, as opposed to what happened to the child? That is what happened. The appellate court, in its opinion, it acknowledged this Court's holding in Arthur H. that the focus is solely at this stage on the child, whether or not the child has been neglected, and not on whether a parent has been neglectful. That is just not the focus of the proceeding there. But then the Court went on to state, but, you know, mother here had no reason to know or suspect that her boyfriend might act neglectfully while her children were in his care while she was at her doctor's appointment, or that he wouldn't provide a safe and nurturing environment as he was caring for them. And so the Court, you know, it did focus. It swung its focus. It said we need to focus on the child, but then it swung right over to mother and what she knew or should have known. But, you know, I mean, as this Court has stated, an adjudication of neglect is not an adjudication that a parent is neglectful. So the adjudication of neglect says nothing about mother or any parent's blame. May I follow that up? So the trial court rejected the allegation of abuse and found neglect and set the case a month later for a dispositional hearing. That's correct. And at that time the court found the mother to be fit, returned the child, and closed the case. That's right. Why is this case not moved? That's a very good question. The adjudication, an adjudication can't be appealed generally until a disposition order. If the case is moved, you know, I mean, really what happens when the adjudication happens is that if, you know, if the neglect finding is made, services are offered right away to the family to get, you know, the children's status and the family more stable. Once the case is closed, they can continue receiving services. In the Juvenile Court Act, those files are confidential, so there's really no ramifications to mother. It's not, there's no record that can be found as would be, you know, when DCFS indicates findings. So that is my question. Are there any collateral consequences from the filing of neglect? You said here that the filing of neglect focuses on the child and not on the parent. That's right. And so does this finding have any collateral consequences on the mother? On the mother, not unless, you know, I mean, the public, nobody's going to know it. Like I said, it's not, it doesn't come up in background checks for employment. So it's not discoverable that way. Now, mother was not indicated. If, for instance, in a case where the parent has been indicated, here the boyfriend was indicated for neglect at the end of the DCFS investigation. But if mother in a case, and that's not this case, had been indicated, then when the case, when that case, the juvenile court case closes, the DCFS investigator normally will ask for, for completion's sake, a copy of the adjudication order from the court case to go into the DCFS's investigatory file. So that didn't happen here, but in some cases that might be what would happen. Here, mother, there's really no ramifications other than, you know, if there were services offered and if he had wanted them, they would have been available. But other than that. Well, there's a certain stigma, right? We understand the difference of neglect as to the child and not as to the mother. But, I mean, a non-neglectful mother, for example, and that would be her position here, right, would have to suffer the indignity of defending the action. So, I mean, is it totally moot in that sense? Well, I understand, you know, that's a very human reaction, is that nobody wants that to have occurred or to be drawn into proceedings. So from that sense, I would agree. But as to any legal ramifications at this point, I don't know what they would be. And this would have been the first instance that that could be appealed, right? You indicated that. After disposition, right? That's the first appealable order, generally speaking. Of course, the mother took this up on appeal to the appellate court. The appellate court reversed it, and then the state brought it up here. That's right. What's the state's interest at this point? Well, the people's interest is in reaffirming this Court's holding in Arthur H. that this is a two-step process that requires, at the first step, just simply looking at the status of the child. Do the circumstances here show that this child has, in some regard, been in a neglectful environment? And in this case, the appellate court, as I said, they acknowledged that that's the required approach, but then really based its decision on its feeling that, you know, mother really didn't do anything here, and so the child, the adjudication should not have been made. The problem with that approach, of course, is that there are times when you're not going to, nobody's going to be able to actually pin down what actually happened, and yet you know from the evidence that something occurred and something is amiss and things need to be remediated in order to stabilize the family and keep the children safe. If you can't make that finding without finding that somehow a parent is to blame, then that leaves, you know, children who are nevertheless in need of protection and care without that. And so that's what, you know, we're asking for, that's the people's interest here is in reaffirming the approach that Arthur H. has held the Juvenile Court Act requires, and that's what we ask that you do. Secondly, in reaching its decision, the appellate court concluded that the trial court abused its discretion when it admitted into evidence a record of a doctor from the Pediatric Resource Center who had examined A.P., the two-year-old who was scalded when a bathtub was left running, on referral from DCFS when it began its investigation into the report that it received from the emergency room that first treated A.P. And the appellate court based its decision that the trial court abused its discretion, it looked at on the basis that Dr. Petrak did not issue her report until approximately three months after A.P. was burned and she examined him and on the fact that it wasn't part of follow-up care. However, Section 218.4.A, under which the trial court allowed this record in, really it's the business records exception to the hearsay rule. Say, wasn't the record or that report made 18 months later or something? No, no, no. That report was, she issued it three months, she issued her report three months later, pretty much in tandem with, as the people set out in its brief, pretty much in tandem with the, in coordination with DCFS's investigation into the report of suspected abuse it had received. What about the original medical records? The original medical records? In what regard? Those were from the St. Francis Hospital and the Springfield Burn Unit? Those were into the record as well. People's Exhibit 1 was the Springfield, the St. Francis medical records and then the Springfield Memorial records were included, I believe, in Exhibit 2. So those were there. Well, may I ask, the state has moved on. What evidence or what argument or proof was made to support the position that these were business records? What did the state say? I'm sorry? This is an abuse of discretion. It is. So what did the court have in front of it? What did the state present? The court had the record, it had Section 218-4A requires a certification and delegation of the authenticity of this, rather than having a record keeper come in and testify and say, yes, this is such and such record, it was made, this is how we make it, and it was made in the usual course of the business. Section 218-4A allows that foundation to be done through a certification. So it had the certification that this report was prepared in the usual course of business of the Pediatric Resource Center and it is the Pediatric Resource Center's business to make this record. And that it's, you know, and so that's what it had. And then it had all, you know, the report and the examination notes. Is there any, you know, discussion as to what the PEC or whatever it is, is or how these records were generated or, I mean, the argument is made that this was not done in the ordinary course of business. This was done in anticipation of litigation. Was there any discussion at the hearing in front of the judge as to why these are not prepared in anticipation of litigation, but rather are business records? What did the state present? The state presented, well, it presented the records, and the records include the doctor's report. You know, it's identified in the, she identifies herself in the record. It's got medical records, you know, her exam notes, and the records of the Pediatric Resource Center itself indicate that it's affiliated with, I believe, St. Francis Hospital and a part of the University of Illinois College of Medicine. So that's what the court had. And, you know, the court is, the trial court, it's within its discretion to decide what to admit or not. And, you know, it looks at these records and it sees records coming before it on a daily basis. And the Pediatric Resource Centers have been admitted, the appellate court, the third district has addressed that in earlier cases where it's been admitted. You know, what those records consisted of, if they were exactly the same, I don't know, but that's what the court had. There was an objection to it at the time. There was an objection. And so was the colloquy, was there any discussion about what is the, I mean, I don't know about the PEC. So was there discussion, was the court informed as to how these records were generated? The court was informed that when DCFS referred the child to the Pediatric Resource Center, the Pediatric Resource Center then conducts this examination, a medical examination of the child, as well as interviewing the mother and reviewing medical records of the child and some DCFS notes and photographs that were taken of him. And that these, you know, she's a doctor and these are things that doctors do and it's got the indications of reliability that a medical record normally has or that a business record normally has and there would be no reason to find that it is not what it's presented to be. And that's what the court had in front of it. And that was the argument. Didn't this report, though, go beyond what we think of as a medical record because it included conclusions as to causation and some conclusions that it couldn't have happened the way this fellow, the babysitter said it happened and so forth? Well, two things about that. First, in the adjudication, the mother first stipulated that the people would call witnesses that would support its allegation that the boyfriend lied when he first told the police his first story of, I think it was that he was in the bathroom and AP ran in and fell headfirst into a tub of water. But then when he told, he finally told the story that, you know, he turned on the water and left the house leaving the kids unsupervised. So there's that. But I'm sorry, could you repeat your question? Well, my question is, I guess it boils down to, are you relying strictly on the statutory basis of admission to say that the statute defines this kind of a report as being admissible and so whatever's in it comes in? Well, but that goes to, that's evidence. You know, the report first is, if the report is what it's certified to be, then whatever is in it, that's evidence that the court is going to weigh along with whatever other evidence it has. And so it's going to weigh whatever, you know, it's going to give it the weight, whatever that has without any kind of testimony explaining what it is. And here, I mean, the court did not accept, you know, the conclusions. It said, I don't understand what that means and I think this is the doctor's best guess and along with all the other evidence, I can't find that this was abuse. The state did not prove abuse here. So the court did, it exercised its discretion. It looked at whether this is allowed to be admitted under Section 218-4A with the delegation and in its discretion it decided that it did and then it weighed the evidence and gave it the weight that it believed it deserved it had. So really, I mean, this is a good example of, you know, how this provision works together with the evidence that comes into the trial court. But in this instance, wasn't this record being introduced as a substitute for expert testimony? You know, that's what the, that's what Mother argued. Right. The record was introduced as medical records for whatever value, whatever weight the court was going to give it. The court just did not give it the kind of weight that, you know, that. So far, after the fact, it appears to be, you know, in place of a true medical expert. But that would be after, that's after the fact is right. I mean, if, and that's my, that's what I'm saying is that the court first admitted it because it's admissible under the language of Section 18-4A, but then without testimony as to what this means, the court couldn't find that it meant, you know, it just could not understand what it meant. As you said, I don't know what this means. I think this is, you know, her best guess. So, you know, I mean, I think that would be the same with any evidence that you're going to bring in. If you're going to present it, if you have a record keeper come and say this is, you know, how this was done and the court says, okay, you met that requirement, but then you don't have anybody to testify as to what it is, then the evidence, you know, it's going to have whatever weight it has in regard to. And the trial court, you know, it's used to looking at this kind of evidence. It's a judge that does the, you know, that weighs the evidence. It's not a jury that's going to be confused by complex evidence that it's not going to understand. And so, you know, that evidence should be admissible and then the judge will exercise his discretion again and weigh the evidence. Thank you. Thank you. No other questions? Time has expired. Counsel for the appellee. May it please the court. I'm Louis Melo. I represent the respondent mother, Lisa P., who is also the appellee. This court is being asked today to decide two very important questions.  in its interpretation of what constitutes an environment injurious to the welfare of a minor? And secondly, did the circuit court exceed the authority under the Juvenile Court Act and overstep the boundaries of basic due process in admitting an opinion letter in lieu of live testimony by the opinion witness? With respect to the first issue, we believe the third district correctly concluded that there was not an injurious environment. The facts below clearly establish that neither parent caused any injury to their children or failed to protect either of their children. In fact, in other words, neither parent failed to exercise the care that their circumstances justly demanded and there was no evidence that the injury to the minor AP could have been predicted by the parents. And certainly, without the ability to predict that a child would be injured, it was impossible for either parent to prevent a child from being injured. The state is urging a radical departure from the established understanding of neglect by espousing a broad and unconstrained interpretation of what constitutes an injurious environment. The state below asked the circuit court to expand the definition of injurious environment beyond what's been previously recognized we would submit by the appellate court. The circuit court obliged the state in its interpretation and expanded that traditional definition of injurious environment to include a parent's child being injured while in the care of virtually anyone with fleeting contact and transitory authority over the child. Under the circuit court's definition, coaches, teachers, even daycare providers who injure a child can generate a finding of neglect. The circuit court's interpretation of an environment injurious to the minor's welfare not only expanded the concept of injurious environment from the parent's home but to someone else's house, in this case a boyfriend's house, who lived separately from the mother. It also flew in the face of the existing appellate rule established by the first district appellate court, NRAMZ, which required foreknowledge on the part of the parent of the dangerous propensities of the third-party caregiver. And as an aside, I will note that the Abuse and Neglected Child Reporting Act and the Juvenile Court Act have provisions that state that a child is not considered a, quote, neglected child, close quote, for the sole reason that the child's parent has left the child in the care  Now, it's hard to imagine that our legislature would reject a finding of neglect under those circumstances but would find neglect merely by leaving the child with any other adult. We believe the third district court appellate court was correct in agreeing with NRAMZ and reversing the circuit court's determination of neglect. What is the neglect that we should focus on? The action of the mother in leaving the child or the children with the boyfriend or the action of the, or what occurred in the boyfriend's home with the child getting injured? Well, the, this court and a number of courts have established a body of case law that suggests that this is an amorphous concept. I've just quoted that one of the criteria is did the parent exercise or fail to exercise the care that the circumstances justly demand under the circumstances. So there's a variety of criteria that we're looking at. If we look at the case law and we line up the case law, they are telling us, and you're asking about neglect but, and I understand that, but this particular neglect is an injurious environment neglect. Not all are the same. It's a very, it's a subset of neglect. And under those circumstances, my understanding of the case law is there's a very strong focus on did the parents do what they were supposed to do or not. Now, I understand Enri Arthur H. says we just look at whether the child was neglected. The problem is that Enri Arthur H. doesn't require a finding just of injury, sickness. It still uses the term neglect. And that neglect, I would argue, connotes some kind of behavior on somebody's part who has some responsibility over the child. I would submit that not every injury constitutes neglect. So, again, my answer is essentially the best answer I can give you under the law is that it depends on the circumstances. There may be times when a child is injured and we can find that there is neglect because of something the guardian or the caretaker did or did not do or some omission or commission. I'm not asking the court to decide whether one parent did something wrong or the other. I believe, though, that, and I understand that this might be a little beyond what you've asked, but this is a situation where the state is seeking to intervene in a family. And we know that the family relationship, the care, custody and control that the parents have over their children is a fundamental right. And so if the state is going to intervene into that relationship, at least under our Constitution, as I understand it, there has to be a, it has to be warranted. And so where a child, where the state finds neglect, and there's no reason for the state to be involved, as I believe is the case here, then that's not neglect. And in this case, there was nothing that, in fact, in this case, there was nothing more that the mother could have done than what she had done. Are you arguing that we should find that the finding of fitness of the mother precludes the finding of neglect in this case? Well, I can't ask the court to do that, because that would be incompatible with the Henry Arthur H. decision. In Arthur H., there was some unknown as to which parent might have been involved. Right. There was an attempt to, the argument that the respondent made is, well, I didn't do anything wrong, so the child can't be neglected. Well, the court was not going to try to decide whether one parent had some culpability or another one didn't. It simply said, we have a child who's clearly not properly dressed, has some medical, you know, whatever, and we're not going to not do anything. We know there was a problem. We know there was a problem with some of the other children. There was an injurious environment component to that as well. But the state's intervention was warranted under those circumstances, because there was evidence suggesting that somebody had dropped the ball with respect to these kids who had responsibility and legal authority over these children. You've used the term environment injurious to welfare, which is the language of the statute. Does that mean something more than one incident of neglect or one incident of an injury? Again, unfortunately, the answer is a typical lawyer's answer, which is it depends on the circumstances and it depends on the type of injury. It depends on what, you know, what surrounds that circumstance. Certainly, if you're on a 20-story building and you're on a balcony that has no fence and you let your children play out there and they get hurt one time, that's probably going to do the trick. But if they're running around in the basement or, you know, somewhere in the house and they trip and they hurt themselves, that may be an entirely different matter. So, again, I'm sorry I can't answer that because the court has indicated that these decisions are sui generis and to some extent we have to look at those facts. I would submit the fact in this circumstances just don't add up. Mr. Millett, with regard to follow-up on Justice Carmeier's question, prior injuries or prior calls to DCFS, do they come in and in every case is it just on the facts of that one call, like this particular situation, the burning? You know, the other circumstances and other times and events, does that come in as well? Or does each case stand on its own? Yeah. So maybe I just want to make sure I understand the question. Is the question that if there's a hotline call that the only information that's imparted at that time is that there's been, in this case, there was a burn and then other information is subsequently developed and introduced? Well, if there were other calls to the hotline in other cases, does that come in? I mean, would that add into the judge's determination of whether or not this was an injurious environment or is it just on each case, this particular burning situation? Are those the only facts that the judge looks at? Well, as it relates to this case, the judge is, I believe, constrained to consider only the facts that are before him or her. Those facts are only for this particular case? Just for this case. Now, I can assure you that, at least in our county, the state's attorney will make it known to the court whether there have been other hotline calls with respect to that child or that parent and seek to introduce evidence along those lines. To the extent that they're aware of it. But that would have to be, in the petition, it would have to be, evidence would have to be presented for the judge to be aware of that. But yes, once that information is before the court, the court certainly could consider those other, if there were other circumstances that would warrant, by themselves or in combination with this particular latest incident, the court could consider that. In this incident, then, was that the only facts before the court? Yeah. Well, in this instance, the state had attempted to suggest that there had been a couple of previous injuries in the petition. Those really didn't pan out. They were essentially deemed accidental. We were able to show that. So there was really nothing in the record other than the fact that my client had gone to the doctor's on her way home, received a call that her child had been scalded, immediately raised home, took the child, immediately took the child to the emergency room. The child was taken down here to Springfield to the burn unit. The child was treated. And, of course, she's not with the boyfriend anymore. But I do want to address. Before you do, does this case hinge, then, on the fact that the mother had, there was no evidence that the mother knew that the boyfriend would act in a neglectful fashion? I believe to a large extent it would because, and that's based on NREMZ criteria, is that if you don't know something's going to happen, you know, it's hard to really say that you've dropped the ball in terms of what the circumstances require as a parent, your duty as a parent. If she had known that this boyfriend, I believe, had a propensity for injuring children, had been indicated once, twice, three times by the DSFS, then that would have been an issue. The question had come up whether this was moot. I would argue, and I think I did in my brief, that there are some very serious consequences that come out of this kind of a situation. Make no mistake about it. There is damage to innocent persons simply by a neglect proceedings and also by finding a neglect. It ranges from the loss of a job because they've had to attend all kinds of hearings, and believe me, the clients that I represent, their jobs are very tenuous. Is that an element that we look at? I mean, we have a whole body of law about mootness, and usually the discussion is if this court can't grant any relief, the case is closed, are there any other collateral consequences? Does this finding by the trial court here have any ramifications in the future? Well, I believe it does. Obviously, it could repeat itself, and that would be one criteria for hearing it, notwithstanding that it may have been resolved in favor of my client. But, yes, there is an indicator reported on the boyfriend, and to the extent that my client would ever want the relationship with that boyfriend, and I'm not suggesting that's necessarily the case, but if she were to want to have a relationship with that boyfriend, a finding of neglect standing alone without regard to who neglected who or who was responsible by the juvenile court has the effect of automatically causing any appeal of an indicator report to be dismissed. So that's a very real legal consequence, and therefore she certainly, that's one person, not that she would want to have a relationship with that person, but that certainly would put, would affect her ability to have a relationship if he has an indicator report. The other matter also is that if there really was a neglect, and I think the court should know that it's not uncommon for states' attorneys to include in their petitions for neglect previous findings of neglect. And the problem, so if there were a problem down the road, hopefully there wouldn't be, I can assure the court that the states' attorney in our county would make sure that that finding of neglect appeared in a juvenile court petition. And the problem there is that it doesn't get sorted out. We don't know who neglected whom, who was responsible for the neglect. All we know is that it's another allegation of the petition that has to be dealt with. But I think there are very real consequences, as I said, on the ground. Mr. Melo, I may be mistaken about what's in the statute, but I thought that when a case proceeds when they're seeking to terminate parental rights, there is a provision in the state statutes that allows X number of findings of neglect or abuse, as the case may be, to be the foundation for the termination of parental rights. Is that correct or not? It can. I just want to know if it's in the statute. I'm trying to run through the statute. I don't know if it would necessarily be in the Juvenile Court Act. It may be under the Adoption Act. But I know that there, it certainly could add up, you know, you could end up sort of with, I can't answer that off the top of my head. I think there may be something in the Adoption Act that might implicate that where you have so many neglects. Here's the only point I'm trying to get at. If, in fact, that's the case, then that would be collateral for sure, if not direct to be a direct problem in the future as a parent to defend against the termination proceeding. Exactly. And what you end up with with a neglect finding is that you end up with collateral, restitutacata problems where all the state has to do is allege that there was a neglect finding and the mother was a party. And it might be very, very difficult at the trial level to try to say, well, no, you can't apply that standard. You can't use restitutacata here. My client had nothing to do with it. You know, you may not get that far. So it can result, I believe, in further proceedings down the road or possibly, as the Chief Justice indicated, possibly termination. But I can't tell you for sure off the top of my head that there is something under the Adoption Act. I know at one time there was something. I don't know if it was still good law. So and, of course, the mootness issue wasn't raised below as well. I want to talk a little bit about the Pediatric Resource Center records. And I know your time is short, but I have one real quick question. The records in question by the doctor, she opined that the Burns were most consistent with child physical abuse. And the trial court said it could not find by proponents of evidence that AP's injury were caused by abuse. So, in other words, the court rejected the opinions of the doctor. If, in fact, these records should not have been admitted, why is it not harmless? Well, our concern was that, in fact, it was harmful in the sense that, while the court below may have rejected the finding of abuse, the court didn't reject the notion that the individual had neglected the child. In other words, that assessment of what had happened, I believe, colored the trial judge's opinion in terms of whether there was neglect in the first place. And so it did have, I believe, an impact on the proceeding. In fact, that was the only evidence that the state presented as the causation. So apart from that evidence, apart from that, I don't believe that certainly they would never approve of the abuse. And I think that it would have greatly diminished the ability of the court to make a finding that there was neglect also. But I wanted to be clear with respect to the Dr. Petrak's letter, which is part of the Pediatric Resource Center records, which is PRC, that that was admitted under Section 218 of the Juvenile Court Act. That was the basis for allowing it in. And I would argue that that was a misinterpretation of what's allowed under that section of the Juvenile Court Act, that normally evidentiary decisions would be abuse of discretion. But in this case, this is really a de novo review, because the court misinterpreted what the Juvenile Court Act allowed. It doesn't allow these kind of records. And these are not agency records, not hospital records. They're none of those things. There's no treatment recommendations in the Dr. Petrak's report. And I've laid out a lot of the reasons for why I think that there's a problem. Reliance, the timeline is that, suggests that they were prepared to coincide with the filing of the Wardship Petition and a parallel criminal investigation. And if we look at the PRC exhibit that was introduced in the evidence, we know from the record that there was a safety plan in place before the child was examined. We know that on August 18th, it was referred to PRC by a DCFS investigator who called it a new case. We know that the child was examined on August 19th of 2010. And then we know from a case note that the boyfriend, Mr. McLee, was charged with endangering the life of a child sometime before October 21st of 2010. And then a subpoena due to... Mr. Melo, your time has expired. Thank you. Rebuttal. Your Honors, first, with regard to Justice Tice's question as to whether or not admission of the Pediatric Resource Center records was harmless error, in this case, if indeed it was error, then it was, there was no harm here  and the trial court did not rely on that, I mean it specifically rejected, just didn't accept her opinion in the first place and did not base its decision of neglect by reason of injurious environment on that report. So, secondly, if you find this case moot, then really this court should vacate the appellate opinion below because the appellate opinion below is just wrong. It's contrary to Arthur H. It does base, it did reverse the trial court's finding on the basis that the mother could not know this was going to happen and so it did put, you know, a factor that was not related to the status of the child into the mix there and based it, you know, just conflated the adjudicatory and the disposition stages. So we would ask that that would be what this court does in that event. Regarding the In re MZ case, that of course was a pre-Arthur H. case and it focused, it talked specifically about the guilt of the parents but Arthur H. is so clear that that's just not what the focus of the adjudicatory hearing is and that is not actually what the purpose of the act is, is not to find guilt, it's to protect the welfare of the minor and to stabilize families wherever that's possible. Regarding the collateral effect of adjudication of neglect, whether or not a finding of neglect would be considered down the road, for instance in termination proceedings, at that point this family has gone through the whole process of reasonable, you know, reasonable efforts being made, the parents not making reasonable progress within all the time frames and so a single, this juvenile court adjudication finding would not be, that may be in that case a collateral effect but it's certainly not going to be whatever tips the balance for bringing termination proceedings because there's just a lot that goes on before termination ever occurs so, you know, I mean generally the collateral effect here is going to be, there is no finding that mother is neglected, neglectful parent and, you know, it's just not going, there's just, assuming that remains that way, there's just not going to be a collateral effect other than, as I stated earlier, DCFS does provide, continue to provide services for families who have gone through this process in the hopes that the family can remain stable and that the child's welfare will be ensured. Regarding... It may be... Regarding whether or not Arthur H. was wrongly decided, Arthur H. is so clearly the right decision because it does protect children who need protection even where it can't be determined ever maybe what exactly occurred that caused this injurious environment and that really needs to be kept in place. It can't be the case that one injury or something is like, well, okay, that's your warning, but it's the child, you have a child at risk and the focus has to be on that child at that point and then the parent will have to at the disposition hearing will focus on the parent and do what needs to be done if anything and it could be, as in this case, the parent is found fit and the case is closed. But that focus has to remain the way it is, it really needs, the two-step process is the correct process and what the legislature obviously intended as this court so clearly explained in Arthur H. And if there aren't any more questions... There was no evidence that the mother was aware of the boyfriend having done this in the past, for example, was that one of the major factors that went into the finding of fitness on behalf of the mother? The trial court did laud mother for doing what needed to be done and taking the correct actions and it did state that it didn't think that she had reason to know that her boyfriend would act neglectfully in the manner that he did and so it took it into consideration at the disposition stage where that's rightly taken into consideration. So why shouldn't that be taken into consideration at the neglect stage? Whether or not there's a finding of neglect, you said the fact that it would do violation to Arthur H. for this court to find that the mother's lack of knowledge of the boyfriend's proclivity to do something like this has nothing to do with the finding of neglect because the neglect goes to the child, not to the mother. And then you went on to say that there's that finding of neglect and then as in this case at the dispositional hearing there's a finding of fitness, the case is closed. So why shouldn't that first criteria, the criteria used at the dispositional hearing, the mother's knowledge, why shouldn't that be part of the finding of whether or not the child was neglected or not? Because whether or not the parent knows in advance that, as you said, some person has a proclivity to behave in a certain way that's going to put their child at risk doesn't obviate the fact that this child is at risk and this child was at risk and something occurred. So to require some kind of notice that the parent had, knew this, it undercuts. It undercuts, it weakens the policy of the Act to Protecting Children because it leaves children at risk. And so it can't be that a finding of neglect would be dependent on whether or not the parent knew. And that's why then the parent, you know, at the next step you're going to look at that because if the parent didn't know, and in the meantime if there's the services that go into place and whatever assessments need to be done to ensure that the parent is fit, that can be done and you've got that time to do that. Mr. Melo said what about placing the child in a child daycare center? It seems to me it might be considered differently if the parent knew that there were a number of problems at this daycare center and children were being injured, or if there had never been any problem. Under your argument, would it mean that if the child, if the daycare center neglected the child in one instance and there was a finding of neglect, or that would lead to a finding of neglect, even though the parent knew nothing about this? I would offer that that's, since these cases are always regenerous and on a fixed basis, so whatever those circumstances may be, but that's qualitatively different than leaving your child with a boyfriend. A daycare center presumably is going to be licensed and regulated, and so there's... Yes, of course, parents and parents' friends are not licensed to have children and take care of them. But then again, I mean, that's all who you're bringing into your family home and your family life. And so doesn't that then hinge on knowledge of whether or not that person you brought into the life has a proclivity to neglect? I'm sorry, could you please ask that? Doesn't the knowledge of the parent then affect whether or not there's neglect if you don't know that the person has any problems in taking care of children, just as you assume that a daycare facility is licensed and therefore is good? And we know that's not necessarily true. But with regard to friends or neighbors or whoever, but that points up why it has to be the two-step process, because the focus has to be on that child's environment and not leaving that child at risk. And that doesn't adjudicate the parent neglectful. I mean, that just says this child is in a situation that needs to be remedied. And so now we can remedy that because it needs to be remedied. And whether or not anybody knew ahead of time, that's still the fact. There's a child in a situation that is an at-risk situation. Your time has expired. Thank you. Ms. Purcell, Mr. Melo, we thank you for your arguments. Case number 113875, Enray, A.P. et al., is taken under advisement as agenda number 10.